# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID ROTH and BETSY ROTH,       )
His Wife,                            )
                                  )
                Plaintiffs,    )
                                  )
      v.                        )    No. 06 CV 1452
                                  )
NORFALCO,                    )
                                  )
                Defendant.    )    Jury Trial Demanded

## DEFENDANT'S RULE 56.1 STATEMENT OF UNCONTRADICTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, NorFalco LLC ("NorFalco"), by its attorneys, Freeborn & Peters LLP, and Tucker Arensberg, P.C. pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the Middle District of Pennsylvania, submits this Statement of Uncontradicted Material Facts in Support of its Motion for Summary Judgment.

## PARTIES

1.      Plaintiff, David Roth ("Roth"), resides at 5536 Stambaugh Road, Spring Grove, York County, PA 17362. (Exhibit A: First Amended Complaint ("Complaint") at ¶ 1.) On August 13, 2004, the date of his claimed injury, Roth was employed as a chemical un-loader by P.H. Glatfelter Company ("Glatfelter"), and worked at its Spring Grove Paper Mill located at

228 Main Street, Spring Grove, Pennsylvania.  (Exhibit B:  Deposition of David Roth, Part I ("Roth Dep. I")[1], at p. 21-25.)

2.      Plaintiff, Betsy Roth ("Mrs. Roth"), is Roth's wife, and resides with him. (Complaint at ¶ 2;  Roth Dep. I at p. 5.)

3.      NorFalco is a registered corporation organized under the laws of the State of Ohio, and is engaged in the sale and distribution of sulfuric acid.  (Complaint at ¶ 2).  NorFalco's principal place of business is Cleveland, Ohio.  (Complaint at ¶ 2; Exhibit C: Deposition of Seay Harder ("Harder Dep.") at 8.)[2]

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      Venue is proper under 28 U.S.C. § 1391(a)(2) because this Court is the United States Court for the District corresponding to the Glatfelter plant where Roth's injury occurred.

## FACTS

### *Glatfelter Paper Mill*

6.      Glatfelter is a manufacturer of paper products with numerous domestic and international facilities.  (Roth Dep. I at 12).

---

[1] Roth's deposition was taken in two parts on February 28 and April 4, 2007.  The pages were not numbered consecutively.  The February 28 deposition will be referred to as "Roth Dep. I" and the April 4 part as "Roth Dep. II."
[2] Seay Harder is NorFalco's Director of Technical Services and Risk Management.  (Harder Dep. at 9.)

7.      At the Spring Grove plant, Glatfelter makes wood pulp and paper products; and, in the course of its operations, generates electricity and sells it to the local electric company. (Roth Dep. I at 12.)

8.      Glatfelter's Spring Grove Mill is a large scale manufacturing plant that purchases 300 to 400 raw materials for use.  (Exhibit D: Deposition of Robert Strine ("Strine Dep.") at 7-8.)

9.      Glatfelter uses large amounts of sulfuric acid in the bleach plant where it treats wood pulp.  (Roth Dep. I at 35-36.)

10.     The majority of the sulfuric acid used at Glatfelter is supplied via railroad tank cars. (Roth Dep. I at 40-41.)

11.     In 2004, NorFlaco was the 100% supplier of sulfuric acid to Glatfelter.  (Strine Dep. at 10.)

12.     Typically, Glatfelter received and unloaded one or two tank cars of sulfuric acid in a week, or one about every three days.  (Roth Dep. I at 51-52; Exhibit E: Deposition of Ralph Martin ("Martin Dep.") at 15.)

13.     A typical sulfuric acid railroad tank car shipped from NorFalco to Glatfelter contains approximately 180,000 to 190,000 pounds of acid (approximately 12,000 to 12,500 gallons).  Glatfelter used about 40,000 pounds of sulfuric acid per day in its bleach plant.  (Strine Dep. at 14.)

14.     Glatfelter has a yard supervisor, Don Wildason, and its own locomotive and train crews to move tank cars throughout its plant. Wildason's group is in charge of moving the cars to the off-loading site, spotting them and then returning them to the "plank area" where the rail carrier picks them up.  (Exhibit F: Deposition of Kevin Lain ("Lain Dep.") at 10.)

15.     In addition to sulfuric acid, the Glatfelter plant routinely uses and unloads caustic, sodium chlorate, hydrogen peroxide and methanol.  (Martin Dep. at 12-13.)

16.     Glatfelter maintains Material Safety Data Sheets ("MSDS") on all materials that it uses.  The purchasing department cannot order a material, like sulfuric acid, unless an MSDS has been obtained, reviewed and approved by the safety department.  (Strine Dep. at 62.)

### *NorFalco*

17.     NorFalco LLC markets, sells and distributes sulfuric acid in the United States. NorFalco purchases sulfuric from five Canadian plants that are owned by an indirect parent company, Xstrata Canada Corporation.  (Harder Dep. at 12-13.)  Sulfuric acid is made at these plants as a by-product of copper smelting.  (Exhibit G:  Deposition of Jocelyn Arcouette ("Arcouette Dep.") at 16-17.)

18.     NorFalco ships much of its sulfuric acid in railroad tank cars that it leases from tank car owners.  (Harder Dep. at 19-20.)  These are typically long term, "full service leases" that include all car maintenance by the car supplier.  (Harder Dep. at 20.)  Procor, GATX and Trinity are its primary car suppliers.  (Harder Dep. at 21.)

19.     NorFalco sends all of its customers, including Glatfelter, an MSDS on sulfuric acid any time they are updated including in 2001, 2002, 2003 and 2004.  A copy of the MSDS sent to Glatfelter in 2003 is attached to NorFalco's Answers Interrogatories. (Exhibit H: NorFalco's Answers to Interrogatories ("Interrog. Ans.") at ¶13.)

20.     All of the tank cars used by NorFalco to ship sulfuric acid are loaded and unloaded at fittings on the topside of the cars.  (Harder Dep. at 41.)

21.     The top fittings consist of the following key components:

(a)    A fill hole (or man hole) and cover that consists of a larger opening to allow filling or loading of the tank.

(b)    A rupture disk and assembly, a safety device that will automatically rupture if the interior pressure in the car reaches a certain level.  Sulfuric acid cars are typically equipped with disks that will rupture at 165 psi.

(c)    An eduction (or discharge) pipe which is used to unload the tank car.  This is typically a 2 or 3" diameter pipe that runs from the top of the car to a sump in the bottom of the tank, and is closed off with a screwed-on cap at the top.

(d)    An air intake pipe and pressure release valve, a 1" diameter pipe equipped with a valve and a cap.  The air inlet pipe and valve are used to depressurize the car before unloading; and to pressurize the car for unloading with air supplied by the customers.  (Exhibit H: Interrog. Ans. at ¶ 4 and exhibits (diagrams and photos) thereto:  NorFalco Brochure on Sulfuric Acid at 19; Binder for 2006 Sulfuric Acid Safety and Training Seminar at "Fittings Arrangements" including "low profile fittings" arrangements.  *See also:* Exhibit I:  photographs produced by Glatfelter Roth Dep. Exhibit 7.)

22.    NorFalco does not own, build or design railroad tank cars.  (Arcouette Dep. at 29.)

23.    In conjunction with railroad tank car owners, NorFalco provides specifications for railcars used to transport sulfuric acid.  The railcar owners furnish options that are within the requirements of the Association of American Railroads ("AAR").  NorFalco will usually pick better-than-average options, and include those in its specifications.  (Harder Dep. at 27.)

24.    NorFalco does not design tank car fittings.  That, too, is done by the tank car owners or manufacturers to meet AAR requirements.  NorFalco is provided with various options

and picks those that it deems to be best, and places those in its specifications to the tank car owner. (Harder Dep. at 28; Arcouette Dep. at 29.)

25.    Tank cars used by NorFalco are designed to prevent acid from spraying from the car. (Harder Dep. at 84.)   The primary safety procedure in handling a sulfuric acid car is to vent pressure from the car; if the car is properly vented, it is completely safe to unload. (Harder Dep. at 84; Exhibit J, Deposition of Thomas Eagar ("Eagar Dep." at 106-107.)[3]  The primary piece of equipment to do this is the one inch air valve on the air intake pipe. (Harder Dep. at 84.)  A person unloading the car will know that there is no pressure in the car when he opens the valve and listens for all of the air to come out. (Harder Dep. at 84-85.)  A person unloading the car could also, as an additional safety measure, crack the fill hole cover. (Harder Dep. at 84.)

26.    Tank car owners or manufacturers are required to follow regulations of the AAR, U.S. Department of Transportation, and equivalent Canadian regulations, in the design of tank cars and fittings. (Harder Dep. at 40-41; Arcouette Dep. at 29.)

27.    Any design for a tank car or tank car fitting, including designs for rollover protection and the eduction pipe, must be approved by the AAR. (Arcouette Dep. at 129.)

28.    None of the railroad tank cars that NorFalco uses have a valve on the eduction pipe. (Harder Dep. at 46.)

29.    All of the tank cars that NorFalco uses are equipped with a stenciled warning in plain view by the top fittings that states:  "Caution: . . . Vent Car Before Unloading." (Harder Dep. at 47;  Interrog. Ans. at 26.  *See also*:  Exhibit K, photograph of stencil.)

30.    Eduction pipes on cars used by NorFalco are equipped with a slotted cap that, much like the cap on a soda bottle, would release pressure when it was opened.  The primary

---

[3] Thomas Eagar is Plaintiffs' liability expert.

purpose of the slotted cap is to release the small amount of pressure that could build up in the small space in the eduction pipe between the cap and the liquid – it was not meant to be a substitute for venting the car as a whole.  But it has the added benefit that if an operator neglected to vent the car pressure and opened the cap on the eduction pipe, any spray would splash downward and away from the operator's face.  (Arcouette Dep. at 37-39;  Harder Dep. at 34-35.  See:  Exhibit L: for photograph and diagram of slotted cap feature.).

31.     [Omitted]

32.     Tank cars are loaded at one of the acid supply sites in Canada, and then shipped via a third-party rail carrier.  After the cars are loaded, the cars are depressurized before being turned over to the carrier.  (Harder Dep. at 55.)  During transit to the customer, the cars can develop pressure (or create a vacuum) due to fluctuations in temperature.  (Harder Dep. at 55-56.)

33.     Cars could also conceivably pressurize if the sulfuric acid reacted with the steel tank, creating hydrogen.  All cars that NorFalco uses, however, are lined with a phenolic lining to limit this reaction.  (Harder Dep. at 56-57.)

34.     NorFalco does not participate in the unloading of sulfuric acid tank cars at its customer plants, including Glatfelter.

35.     As a "Responsible Care" company, however, NorFalco provides its customers with technical support that includes written information, a web site, information and training seminars and customer site visits.  (Harder Dep. at 61 - 74)

### *Roth*

36.     Roth was born on January 25, 1958, and is presently 50 years old.  (Roth Dep. I at 5.)

37.     Roth has worked for Glatfelter since 1981.  (Roth Dep. I at 7.)  Over the years, he has worked as a recovery boiler operator, cleaning and maintaining boilers; a print sampler, quality control;  a coater general helper, loading rolls of paper onto a coating machine; and, a lube utility helper, cleaning up and greasing bearings components on machines  (Roth Dep. I at 10-19.)  In April of 2002, Roth became a lubricator and worked throughout the plant greasing and maintaining machines.  (Roth Dep. I at 19-20.)  He held this position until August 3, 2004, when he became the chemical unloader.  (Roth Dep. I at 22-23.)

38.     As a lubricator, Roth was also the back-up chemical unloader.  (*Id.*;  Martin Dep. at 41.)  He first became involved in the un-loading of chemicals from trucks or train tank cars about two years before the date of his accident.  (Roth Dep. I at 24-25.)  As of August 13, 2004, he had unloaded or participated in the unloading of a railroad tank car containing sulfuric acid less than 50 times.  (Roth Dep. I at 50-51.)

39.     Roth's training for chemical unloading consisted primarily of on-the-job training by his predecessor, Jeff Lau; but he was provided with a training manual consisting of written materials including instructions to unload sulfuric acid and other chemicals from railroad tank cars.  (Roth Dep. I at 52-55, 64; Martin Dep. at 41-42.)

40.     Exhibit 5 to Roth's Deposition contains written instructions and hazard communication that he received regarding unloading sulfuric acid.  (Roth Dep. I at 66, and Exhibit N:  Roth Dep. Exhibit 5.  *See also* Martin Dep. at 44-45.)  These are the complete instructions that were in effect on August 13, 2004.  (Martin Dep. at 109-110.)

41.    According to Roth[4], at that time of the accident, Glatfelter required Roth to wear only goggles, rubber gloves and boots when he was unloading a railroad tank car with sulfuric acid. (Roth Dep. I at 59.)  Glatfelter did not require Roth to wear a full face shield. (Roth Dep. I at 59-60; Exhibit N Dep. Ex 5 to Roth Dep. at page 2 of Hazard Communication;  Martin Dep. at 147.)

42.    At the time of the accident, Glatfelter did have full chemical resistant suits and full face shields available, and they were used for other job tasks.  (Roth Dep. I  at 98-99.)

43.    Roth testified that when he unloaded chemicals before and at the time of his accident, he would wear rubber boots and gloves, the goggles and chemical resistant pants.  He testified that he would not wear a full face shield or a chemical resistant top, but only a normal T-shirt.  (Roth Dep. I at 101.)  According to Roth, no one at Glatfelter ever told him that he was not wearing the proper personal protective equipment when unloading sulfuric acid tank cars. (Roth Dep. I at 105.)

44.    Before August 13, 2004, Glatfelter communicated to Roth, both orally and in writing, the hazards of sulfuric acid.  He was told that it would burn the skin, that the fumes should not be breathed in, and that it was corrosive.  (Roth Dep. I at 62; and Exhibit N which is Exhibit 5 to the Roth Dep. at "Hazard Communication.")

45.    Glatfelter was in possession of an MSDS on sulfuric acid on August 13, 2004.  It used this to create the Hazard Communication Sheet that was provided to employees as a condensed version of the MSDS.  (Martin Dep. at 122-123.)

---

[4] NorFalco does not accept substantial portions of the testimony of Roth and Glatfelter as true, but refers to this testimony only because even if true, it does not sustain Plaintiffs' causes of action.  Thus, any statements of fact that indicate "according to," that a witness "testified" to facts or "opined", are intended only to state the fact that the witness so said, testified, or opined without acknowledging the ultimate truth of those facts.

*Unloading Procedures*

46.     When sulfuric acid was needed, Don Wildason's train crews brought a loaded car to the chemical unloading area that consisted of a platform high enough to allow access to the top of the cars for unloading.  (Lain Dep. at 10)  The platform was equipped with pipes for air, used to pressurize the car for unloading, and the acid that was unloaded and directed to a sulfuric acid storage tank.  (Roth Dep. I at 90-91  and see also Exhibit O, Photographs of Glatfelter Platform)

47.     Roth testified, in sequence, the steps to unload sulfuric acid as it was taught to him:

(a)     Roth puts on his rubber boots, rubber gloves and goggles.

(b)     The railcar is secured by signs and a "derailer" on the track to prevent other trains from entering the siding.

(c)     The Glatfelter acid storage tank level is checked to make sure that there is enough capacity in the tank.

(d)     Roth climbs onto the railcar and unhooks the chain across the top fitting platform.

(e)     Once on top of the car, Roth makes sure the air intake valve is closed, and then unscrews the cap on the air intake pipe.

(f)     Roth cracks the valve on the air intake to "depressurize the car, to bleed it off."  All of the air pressure must first be let out of the car because "if you take that cap off (of the eduction pipe) and there's pressure in there acid can come out."  (Roth Dep. I at 75-76.)  The sound of the air that comes out when the valve is cracked or open is "very loud."  (Roth Dep. at 146.)

(g)     After the air is bled off, the cap on the eduction pipe is removed.

(h)     A Glatfelter-supplied elbow pipe with a valve is then screwed on to the eduction pipe, and tightened with a pipe wrench.

(i)     A rubber unloading hose is attached to the elbow.

(j)     An air supply hose is attached to the air intake pipe on the tank car.  Air is then pumped in to the car to force the acid out through the eduction pipe.

(k)     The valves on Glatfelter's unloading lines are opened, and the acid flows from the tank car through the elbow into the hose and eventually into Glatfelter's storage tank.

(l)     Roth monitors the acid flowing in to the storage tank, and observes the tank car and lines to make sure there are no leaks or problems.  Glatfelter's air line is equipped with a remote shut-off valve that could be used to stop the air flow if there was a problem.

(Roth Dep. I at 72-80.)

48.     Roth could tell that a railcar was empty when the rubber unloading hoses began to shake.  He testified to the steps that he was trained to take after the acid was completely unloaded, as follows:

(a)     Roth goes up onto the platform and shuts the air supply off at Glatfelter's valve.

(b)     On the rail car itself, he shuts the valve on the air intake pipe, and then removes the air supply hose from the intake pipe.

(c)     Next, he cracks the air intake valve to start depressurizing the railcar and, only if air was coming out of the air intake pipe, it would be opened "all the way to bleed the air pressure off the car." (Roth Dep. I at 87, 89.)  He would verify this by listening to the air flow, or by putting his hand in front of the pipe to feel for air flow.  (Roth Dep. I at 90.)

(d)     Turning then to the acid lines, Roth shuts both the valves on Glatfelter's acid line and the elbow pipe attached to the eduction pipe and then removes the unloading hose from the elbow pipe.

(e)     Then, "we check the air again to make sure all the air is off that car.  And once that's done . . . [t]hen we get a pipe wrench and start disconnecting the elbow that goes around and around and around until that's disconnected."  (Roth Dep. I at 91-92.)  The elbow screws off.

(f)     The caps are replaced on both the eduction pipe and the air inlet pipes on the tank car.

(g)     The safety signs and derailer are then removed and the Glatfelter train crew is contacted to remove the railcar from the unloading area.

(Roth Dep. I at 86-94.)

49.     The unloading procedure described by Roth is generally consistent with the instructions that Glatfelter supplied.  (Ex. N: Roth Dep. I Exhibit 5.)  The instructions expressly advise that when unloading a railcar, the first component that is handled is the air intake: "Crack valve on air inlet to relieve any built up pressure in the car.  Let bleed off fully before continuing." Similarly, when disconnecting an empty car, the instructions require: "Crack valve on air inlet to relieve the air pressure.  Do not continue until you no longer hear or feel any air." (*Id.*)

50.     Roth testified that he typically did not open the man hole cover when he was unloading a sulfuric acid car.  (Roth Dep. I at 81.)  He testified, however, to an "isolated incident" before his accident when Ralph Martin told him to open the manhole cover and check the level of acid because a railroad engineer thought that the car was not completely empty.

(Roth Dep. I at 81-82).   In this instance, he is "pretty sure" that he checked and relieved the air pressure by opening the air intake valve on the car before opening the man-hole cover.   (Roth Dep. I at 83-84.)   He stated that he would do this typically because "on a full car if there's any pressure in there it would push acid out where we connect the hose to."   (Roth Dep. I at 83.)

51.     It would generally take about two hours to unload a full tank car.   (Martin Dep. at 15.)

### Roth's Accident

52.     On August 13, 2004, Roth was sprayed with sulfuric acid while he was attempting to remove Glatfelter's elbow pipe from a railroad tank car that had been partially emptied. (Complaint at ¶¶ 13-14.)

53.     On that date, and for several weeks before, Glatfelter was not following its normal procedure of unloading sulfuric acid to the acid storage tank.   During a normal, bi-annual shut down of the plant, the acid storage tank was damaged and was taken out of service.   (Roth Dep. I at 107-109.)

54.     While the storage tank was being repaired, Glatfelter by-passed the storage tank by unloading sulfuric acid from the tank cars to a pump house and then directly to the bleach plant.   (Roth Dep. I at 116-117.)   To get the acid to the bleach plant, the air pressure on the car had to be increased from a normal of 30 psi, to 40 or 50 psi.   (Roth Dep. I at 119-120.)

55.     The flow of sulfuric acid was now controlled by the needs of the bleach plant; and, instead of unloading in two hours or so, the tank cars were hooked up for several days. (Roth Dep. I at 132-133.)

56.     During this period of time, Roth was required to check the tank cars being unloaded every morning by opening the fill-holes, and "dipping" the contents with a wood

gauge, to determine the level of remaining acid.  (Roth Dep. I at 133-134.)  He would always make sure that the cars were depressurized before opening the fill-hole cover, by cracking and opening the valve on the air intake pipe.  (Roth Dep. I at 136-138.)

57.    Also, while the storage tank was out, Martin asked Roth if he would "bleed off" the railcars.  Roth stated that he did, and "he (Roth) understands there can be pressure buildup in the cars . . . "  (Martin Dep. at 59.)

58.    One or two days before August 13, 2004, the acid flow stopped from a tank car that was being unloaded to the bleach plant.  (Roth Dep. I at 140.)  Roth reported this to Ralph Martin who determined that they would bring in a full car, and unhook the partially unloaded car and put it out in storage and to try to finish unloading it on another day.  (Roth Dep. I at 141-142.)

59.    Martin told Roth to disconnect the acid line and air hose from the partially-emptied tank car.  Roth testified that he went on the rail car, shut the air intake valve, removed the air hose and then opened the air intake valve to bleed off all of the air pressure.  He testified that he then shut the valves on Glatfelter's acid line, disconnected the unloading hose, and put the hose back on Glatfelter's platform.  (Roth Dep. I at 145-147)

60.    At the first part of his deposition, Roth testified that he then "shut that . . . inlet air valve and put the cap on, on tight.  There's a cap that goes outside of that valve."  (Roth Dep. I at 148.)  This cap screws on to the air inlet pipe and is part of the tank car itself.  (*Id.*)  Roth said that he left the Glatfelter elbow pipe screwed to the eduction pipe "because they were gonna bring it back in again" (Roth Dep. I at 149), and to "identify the exact acid car."  (Roth Dep. I at 156.)  The railcar was then taken out of the area and a full car brought in.  (*Id.*)

61.     At the second part of the deposition, Roth testified that he did not shut the valve on the air inlet pipe, but that he left it cracked, or partially opened, when he left the car.  He did not mention putting the cap back on.  He had never done this before as part of his procedures; and this is the only time he ever left the valve on the air take pipe open when he left the top of a tank car.  (Exhibit P:  Roth Dep. II at 11-13, 37.)

62.     Roth identified the components on the tank car on several photographs.  (Roth Dep. I at 149-155, and Exhibit I, first four photographs.)  Although he could not confirm that these photographs depict the car that was involved with his injury, the components look like those on the actual car.  (Roth Dep. I at 150-151.)  He identified and marked the air intake pipe, eduction pipe with the Glatfelter elbow attached, and fill-hole cover.  (Exhibit I, first photographs.)  In these photographs, the air intake valve appears to be closed.  (Roth Dep. II at 23.)  Roth stated that he thinks the elbow pipe depicted in the photograph is probably the one he was handling when he was injured.  (Roth Dep. II at 44-45.)

63.     According to Glatfelter personnel, when the car was set aside there was approximately 1,000 gallons of sulfuric acid still inside the tank.  (Roth Dep. II at 6, 10.)  There is no evidence, however, that this was verified; and the actual contents of the car is therefore unknown.  (Eagar Dep. at 20.)

64.     The partially unloaded tank car was then put in the yard where it sat for a day or two; but Roth could not recall how many days before his accident this was done.  (Roth Dep. II at 33.)

65.     The accident occurred on August 13, 2004, in the afternoon.  According to Roth, the acid storage tank was coming back on line, and Ralph Martin decided to bring in full tank cars to fill it up.  Therefore, no further unloading of the partially-emptied tank car would take

place, and it would be sent back. (Roth Dep. II at 27.) Martin instructed Roth to go up on the car and take the Glatfelter elbow off. (Roth Dep. II at 28.)

66.     According to Ralph Martin, he and Roth talked about 15 minutes before the accident. They anticipated that they were going to need additional acid during the night and there was only a small amount left in the tank car that was in the unloading area. So, he told Roth that they need to move that railcar out and get a full one in. (Martin Dep. at 50-51.)

67.     Roth then went up on the car. He was wearing boots, chemical resistant pants, a cotton t-shirt, goggles, a hat and gloves. (Roth Dep. II at 29.) Martin, who saw Roth go to the car, said nothing to Roth about what Roth was wearing. (*Id.*) Martin testified that he did not pay attention to what Roth was wearing when he talked with him shortly before the accident, and did not observe what Roth was wearing as he walked towards the railcar. (Martin Dep. at 142-144.)

68.     After climbing up on the car, Roth began to unscrew the elbow pipe, and "acid started to fly out." (Roth Dep. II at 33.) He was splashed with the acid on his face, neck, chest and arms. (Roth Dep. II at 39.) Roth testified that before removing the elbow pipe, he did nothing to remove any pressure in the tank car, such as open the air intake valve, because "[t]he car was already depressurized, already did that. There was no procedure for the second time on the car." (Roth Dep. II at 35.) He did that at least two days before. Roth did nothing to check the location of the air intake valve to see if it was still cracked when he got on the car. (*Id.*)

69.     Roth has no explanation for how his accident occurred. (Roth Dep. II at 38.)

### *Glatfelter's Investigation*

70.     Glatfelter performed an investigation of the accident scene where Roth was sprayed with acid. Investigators found that the air intake valve was in the closed position. (Exhibit Q: Casilio Dep. at 125-128 and Exhibit R: Memo.)

71.     Glatfelter found that the accident was caused by "human error" consisting of Roth's failure to depressurize the car prior to removing the elbow from the eduction pipe, which was a violation of the established unloading procedure and the sole and proximate cause of the Roth's injury.  (Casilio Dep. at 82, 143.)

72.     Nobody recorded, or knows, the identifying number of the tank car that was involved in Roth's accident.  (Roth Dep. I at 48; Martin Dep. at 61;  Lain Dep. at 44;  Casilio Dep. at 59.)

73.     According to both Glatfelter and NorFalco records, there were four sulfuric acid tank cars at Glatfelter on August 13, 2004:  PROX 16048, PROX 15269, PROX 16137 and UTLX 125169. (Strine Dep. at 51-52; See also, Exhibit H, NorFalco Answers to Interrogatories ("Interrog. Ans.") at ¶ 8.)

74.     According to several Glatfelter witnesses, overall photographs that would show the entire railcar, including the splash pattern of the spilled acid and both ends of the car, were taken, but they "seem to have disappeared." (Martin Dep. at 61, 99-101; Lain Dep. at 30-34.)

75.     Nobody at Glatfelter ever found, concluded or reported anything to be wrong or improper about the tank car.  (Lain Dep. at 86; Casilio Dep. at 144-145.)

76.     Although NorFalco attempted to get information from Glatfelter about the accident, Glatfelter would not provide it.  (Harder Dep. at 154-158, and Exhibits S and T (emails).)  Because of that, NorFalco was not aware of what car was alleged to be involved in the accident, or whether there was any problem with the car.  (Harder Dep. at 156.)

77.     There are no sulfuric acid railroad tank cars in existence that are equipped with a valve on the acid eduction pipe. (*See* Arcouette Dep. at 121; Eagar Dep. at 101.)

### *Regulation of Transportation and Unloading of Sulfuric Acid*

78.     The Hazardous Materials Transportation Safety Act ("HMTA"), 49 U.S.C. §
5101, *et seq*., regulates the transportation of hazardous materials in commerce.  The express
purpose of the HMTA is "to protect against the risks to life, property, and the environment that
are inherent in the transportation of hazardous material in intrastate, interstate and foreign
commerce." 49 U.S.C. § 5101.  The HMTA provides a broad mandate to the Secretary of
Transportation to prescribe regulations for the safe transportation and security of hazardous
materials, governing the conduct of those parties that offer hazardous materials for
transportation, those who package or inspect, and carriers.  49 U.S.C. § 5103(b)(1).

79.     The HMTA provides for preemption of state law as follows:

**§ 5125. Preemption**

> **(a)     General**.  Except as provided in subsection (b), (c), and (e) of this
> section and unless authorized by another law of the United States, a requirement
> of a State, political subdivision of a State, or Indian tribe is preempted if:
>
> > **(1)**     Complying with a requirement of the State, political
> > subdivision, or tribe and a requirement of this chapter, a regulation prescribed
> > under this chapter, or a hazardous materials transportation security regulation or
> > directive issued by the Secretary of Homeland Security is not possible; or
> >
> > **(2)**     the requirement of the State, political subdivision, or tribe,
> > as applied or enforced, is an obstacle to accomplishing and carrying out this
> > chapter, a regulation prescribed under this chapter, or a hazardous materials
> > transportation security regulation or directive issued by the Secretary of
> > Homeland Security.
>
> **(b)     Substantive differences.**     (1) Except as provided in subsection
> (c) of this section and unless authorized by another law of the United States, a
> law, regulation, order, or other requirement of a State, political subdivision of a
> State, or Indian tribe about any of the following subjects, that is not substantively
> the same as a provision of this chapter, a regulation prescribed under this chapter,
> or a hazardous materials transportation security regulation or directive issued by
> the Secretary of Homeland Security, is preempted:

   **(A)** the designation, description, and classification of hazardous materials.

   **(B)** the packing, repacking, handling, labeling, marking, and placarding of hazardous material

   **(C)** the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents.

   **(D)** the written notification, recording, and reporting of the unintentional release in transportation of hazardous material.

   **(E)** the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

  (2) If the Secretary prescribes or has prescribed under §§ 5103(b), 5104, 5110, or 5112 of this title or prior comparable provision of law a regulation or standard related to a subject referred to in paragraph (1) of this subsection, a State, political subdivision of a State, or Indian tribe may prescribe, issue, maintain, and enforce only a law, regulation, standard, or order about the subject that is substantively the same as a provision of this chapter or a regulation decide on and publish in the Federal Register the effective date of section 5103(b) of this title for any regulation or standard about any of those subjects that the Secretary prescribes.  The effective date may not be earlier than 90 days after the Secretary prescribes the regulation or standard nor later than the last day of the 2-year period beginning on the date the Secretary prescribes the regulation or standard.

  (3) If a State, political subdivision of a State, or Indian tribe imposes a fine or penalty the Secretary decides is appropriate for a violation related to a subject referred to in paragraph (1) of this subsection, an additional fine or penalty may not be imposed by any other authority.

49 U.S.C. §5125.

  80. Paragraphs 80 to 84 omitted.

  85. DOT Regulations pursuant to authority of the HMTA provide for preemption with substantially the same language, but additionally state that "'substantively the same' means that the non-Federal Requirement conforms in every significant respect to the Federal Requirement."

49 CFR § 107.202(d).

86.     Pursuant to this statutory mandate, the Department of Transportation has issued comprehensive Hazardous Material Regulations ("HMR") governing the transportation of hazardous materials including the designation of materials as hazardous, classification of hazard, appropriate packaging based on classification, training, marking and labeling, and design requirements for packaging including railroad tank cars. 49 CFR Parts 171-180.

87.     Sulfuric Acid with more than 51% acid, is designated as a Class 8 "corrosive" hazardous material under HMR. *See* 49 CFR § 172.101, at table; 49 CFR § 173.136 (defining "corrosive material" as a liquid or solid that causes full thickness destruction of human skin at the site of contact within a specified period of time, or which has a severe corrosion rate on steel or aluminum.) All packaging containing sulfuric acid must be labeled with the designation "1830." 49 CFR § 171.101.

88.     If sulfuric acid is shipped in bulk in a railroad tank car, it can only be shipped in the follow designated car types: Class DOT 103, 104, 105, 109, 111, 112, 114, 115, or 120 tank car tanks; Class 106 or 110 multi-unit tanks and AAR Class 206W tank car tanks. 49 CFR §173.242(a).

89.     As indicated previously, the tank car involved in plaintiff's injury is unknown. (*Supra* at ¶ 72.) However, each of the four NorFalco-supplied railcars at Glatfelter on the day of the occurrence were designated "111A100W2, " a non-pressure tank. 49 CFR § 179.200. (*See* Exhibit U: AAR Applications for Approval and Certificates of Construction, and R1 Report of Tank Car Repair, Alteration or Conversion ("AAR Applications and Certificates").)

90.     Any railroad tank car used to transport a hazardous material must be built to precise specifications in Part 179 of the HMR. 49 CFR § 179.1(b)("tanks . . . must be built to the specifications prescribed in this part.").

91.     The HMR delegate authority to the Tank Car Committee ("Committee") of Association of American Railroads ("AAR"), to approve designs, construction and materials of all tank car tanks, or changes and additions to specifications.  49 CFR § 179.3, 179.4.

92.     The Committee consists of representatives from railroads, the petroleum industry, the tank car manufacturing industry, manufacturers of fittings, valves and axles, DOT and the Chemical Manufacturer's Association.  (Exhibit V:, Deposition of John Badger ("Badger Dep.") at 63-65.)

93.     Applications must be submitted to the Committee for approval of designs and construction, which will be approved "if in the opinion of the Committee, such tanks or equipment are in compliance with the requirements of this subchapter . . . "  49 CFR § 179.3(b).

94.     Tank car tanks cannot be constructed and put in to service without express approval of the AAR; and

> Before a tank car is placed in service, the party assembling the completed car shall furnish a Certificate of Construction, Form AAR 4-2 to the owner and Executive Director – Tank Car Safety, AAR, certifying that the tank, equipment and car fully conforms to all requirements of the specification.

49 CFR § 179.5(a).

95.     The HMR contain general requirements for tank cars, governing issues such as tank mounting, welding, interior heating systems, capacity, coupler restraint systems, pressure relief devices, tank-head puncture-resistance system, thermal protection and marking.  49 CFR §§ 179.10 to 179.22.

96.     A separate section of the HMR govern requirements for non-pressure tank car tanks that includes the 111AW tank that NorFalco used to ship sulfuric acid.  *See* generally 49 CFR § 179-200.

97.     In that section, provision is made for "Gauging devices, top loading and unloading devices, venting and air inlet devices," as follows:

(a)     When installed, these devices *shall be of an approved design* which will prevent interchange with any other fixture, and be tightly closed.   Unloading pipes shall be securely anchored within the tank.   Each tank or compartment may be equipped with one or separate air connections.

(b)     When the characteristics of the commodity for which the car is authorized are such that these devices must be equipped with valves or fittings to permit the loading and unloading of the contents, these devices, including valves, *shall be of an approved design*, and provided with a protective housing except when plug or ball type valves with operating handles removed are used.   Provision shall be made for closing pipe connections of valves.   49 CFR § 179.200-16 (*emphasis* added).

98.     "*Approved*" under part 179 of the HMR expressly "means approval by the AAR Tank Car Committee."  49 CFR § 179.2(a)(2).

99.     The AAR publishes Specifications for Tank Cars in the AAR Manual of Standards and Recommended Practices.   (Eagar Dep. Ex. 1 Exhibit W.)  These specifications contain some specific requirements for "Eduction Pipes" on all pressure and non-pressure tank cars at Chapter 2.2.4.  § 2.2.4.3. states:

Bleed holes in eduction pipes closed with pipe caps are prohibited.   Approved means must be provided to relieve pressure.

100.     The AAR specifications also call for new, lower level rollover protection to be installed and phased in on all tank cars used for sulfuric acid service. (*Id.* at § 2.2.3.3.)

101.    Neither the HMR nor the AAR Manual of Standards and Recommended Practices call for a valve on the eduction pipe of a non-pressure tank car used to transport sulfuric acid. (*See:* generally 49 CFR § 179; Exhibit W.)

102.    Each tank car supplied by NorFalco at Glatfelter on the day of Roth's accident was an AAR-approved design for the transportation of sulfuric acid, including specific approval of the designs for "Venting, Loading and Discharge Valves." (*See* Exhibit U: AAR Applications and Certificates.)

103.    Each of these tank cars was approved for construction and certified for use by AAR without any requirement that the acid discharge pipe be equipped with a valve. (*See* Exhibit U: AAR Applications and Certificates.)

104.    With respect to three out of four of the cars, the fittings had been converted to the newer, low-profile, type that is being phased in over time to enhance safety in the event of a derailment and roll-over. Again, the AAR tank car Committee approved these newer designs without requirement for a valve on the discharge pipe. (*See* Exhibit U: Applications and Certificates at R1 Reports.)

105.    No disclosed evidence indicates that the tank cars used by NorFalco failed to comply with all HMR requirements on marking, labeling or warning; or that required shipping papers were not used.

106.    There is no claim made in this case, and no evidence disclosed, that the tank cars used by NorFalco to ship sulfuric acid to Glatfelter did not comply with all DOT and AAR regulations and requirements.

***OSHA Regulations***

107.    The Secretary of Labor is designated to promulgate occupational health and safety standards in the workplace.  29 U.S.C. § 651; 29 CFR § 1910.1.  Occupational Health and Safety Standards ("OSHA regulations") are set forth in Chapter 1910 of the Code of Federal Regulations.

108.    Subpart Z of Chapter 1910 is devoted to "Toxic and Hazardous Substances."

109.    Glatfelter, as a "person engaged in a business where chemicals are . . . used," is an "employer" under OSHA regulations.  29 CFR  § 1910.1200(c).

110.    NorFalco, as "a business . . . which supplies hazardous chemicals . . . to employers," is a "distributor" under OSHA regulations.  29 CFR § 1910.1200(c).

111.    OSHA regulations require that a chemical manufacturer develop a material safety data sheet ("MSDS") for each hazardous chemical produced.  29 CFR § 1910.1200(g)(1).  The MSDS must contain identifying information for the chemical, its composition and/or ingredients, physical and chemical characteristics of all hazardous ingredients, health hazards, primary route of entry in to the body, permissible exposure levels, generally applicable precautions for safe handling, generally applicable control measures such as work practices and personal protective equipment, and other information.  29 CFR § 1910.1200(g)(2).

112.    There is no claim in this case that an MSDS was not provided to Glatfelter, or that it was inadequate or improper.  (Eagar Dep. at 84.)

113.    Hazard communication and safety of employees is the sole responsibility of the employer, Glatfelter, under the OSHA regulations.  The employer is required to develop and implement a written hazard communication program in the workplace.  29 CFR § 1910.1200(e). The employer "shall provide employees with effective information and training on hazardous

chemicals in their work area . . ." (29 CFR § 1910.1200(h)(i); and must train its employees on methods of detection, physical and health hazards, and measures employees can take to protect themselves from these hazards, including specific procedures the employer has implemented to protect employees from exposure to hazardous chemicals, such as appropriate work practices, emergency procedures and personal protective equipment to be used.    29 CFR § 1910.1200(h)(3).

### *Plaintiffs' Complaint*

114.    Count I of Plaintiffs' Amended Complaint is based on strict products liability under Section 402(A) of Restatement Second of Torts.  In sum, Plaintiffs allege that NorFalco "designed, manufactured and/or assembled components on the railroad car used to unload the acids..." (Complaint at ¶ 18) and that the tank car was "dangerous and defective because it did not contain components which would indicate pressure in the railroad cars or valves or other components which would prevent acid from spraying onto people..." (Complaint at ¶ 19.)

115.    In Count II, Plaintiffs claim that NorFalco is strictly liable because "the unloading of the sulfuric acid from the railroad tank cars was an abnormally dangerous activity in that sulfuric acid could spray from said cars in tremendous amounts and force that could cause severe burning to persons unloading like the Plaintiff even through the exercise of the utmost care." (Complaint at ¶ 29.)

116.    Count III alleges that NorFalco was negligent in the in failing to:

   (c)    to place valves and blinds on the pipes to prevent acid spraying ;

   (d)    to place gauges on the car which would inform a person of the pressure in the car;

(e)   to place adequate warnings and directions on the car or provide them with the distribution and sale of the subject product;

(f)   to provide adequate protective clothing to prevent a person from being burned when they were removing the acid from the railroad tank cars;

(g)   to inform people as to the proper way to ensure that they would not get sprayed with acid;

(h)   to design a process or procedure that would permit the acid to be removed from the railroad tank car in a safe manner;

(i)   to have a fail-safe mechanism to prevent people from being sprayed with the acid;

(j)   to have lights or warnings to prevent a person from being sprayed with the acid.

(Complaint at ¶ 39)

117.   In Count IV, for Breach of Warranty, Plaintiffs claim that NorFalco expressly and impliedly warranted that its product could be removed and distributed in a safe and prudent manner, and that NorFalco breached its warranty when the subject product distributed and sold sprayed on Roth, causing severe burns.  (Complaint at ¶ 43-44.)

118.   In Count V for Loss of Consortium, Ms. Roth's claim loss of consortium based in the causes of action brought by Roth. (Complaint at ¶ 46-47.)

### *Plaintiffs' Liability Expert*

119.   Plaintiffs disclosed Thomas Eagar, S.B., Sc.D., a professor at MIT, as a liability expert.  (Exhibit Y: Report of Thomas W. Eagar ("Eagar Report"); Exhibit Z: *Curriculum Vitae* of Thomas W. Eagar ("Eagar CV").)

120.     The essence of Dr. Eagar's opinion is that the eduction pipe on the tank car should have been equipped with a shut-off valve. (Eagar Report at ¶¶ 3, 6 and Conclusion.)

121.     Dr. Eagar's professional focus is on materials processing and manufacturing, with a special interest in welding and joining of metals, and failure analysis. (Exhibit Z: Eagar CV at 1; Eagar Dep. at 93.)

122.     Dr. Eagar has no experience in designing or manufacturing railroad tank cars or tank car fittings or getting them certified. (Eagar Dep. at 51, 97.)

123.     Dr. Eagar has no experience in the transportation of sulfuric acid by rail. (Eagar Dep. at 56.)

124.     Dr. Eagar is not a transportation or logistics expert, or a DOT expert. (Eagar Dep. at 92, 98.)

125.     Dr. Eagar did not review the HMTA or HMR for this case. (Eagar Dep. at 56.)

126.     Since he is a "materials engineer" and "failure analyst," not a "tank car person," Dr. Eagar was not, before reviewing this case, familiar with the approval process for tank car design by DOT and AAR. (Eagar Dep. at 55-56.)

127.     Dr. Eagar acknowledges that the addition of a valve on the eduction pipe of a sulfuric acid tank car would be "in addition to" the requirements of AAR specifications. (Eagar Dep. at 87.)

128.     Dr. Eagar testified that there is no industry standard regarding the use of valves on the eduction pipe of sulfuric acid tank cars. (Eagar Dep. at 101.) He did not research whether there are any sulfuric acid tank cars in existence that are equipped with a valve on the eduction pipe. (*Id.*)

129.   Dr. Eagar agrees that if one vents a sulfuric acid tank car to release any pressure before opening it, it is completely safe to unload; and that if Roth "had vented it there's no question this (the accident) wouldn't have occurred." (Eagar Dep. at 106-107; 121.)

130.   Dr. Eagar acknowledges that even if the eduction pipes on sulfuric acid cars were equipped with a valve, this would not eliminate accidents, agreeing that someone along the way would open the valve without venting the car and get splashed. (Eagar Dep. at 121.) Dr. Eagar, however, opines that the valve would have been a "redundant safety device," that would reduce accidents; and in this regard he relies on NorFalco's incident tracking that show 6-8 unloading incidents at customer sites. (Eagar Dep. at 120-121; Exhibit Y: Eagar Report at ¶ 5.)

131.   The only thing that Dr. Eagar did to determine if the addition of a valve on the eduction line was practical was to look at some materials that indicate that there were valves on cars used to transport other acids, and talk to an undisclosed "expert" by the name of "Mr. Bolds" who advised Dr. Eagar that he (Bolds) saw no reason that the AAR would not approve a valve. (Eagar Dep. at 134.)

132.   Thus, when asked whether he did anything specifically to look at whether adding a valve on the eduction line would cause other safety concerns such as in rollovers, Dr. Eagar relied exclusively on the statement of the un-disclosed Mr. Bolds to the effect that he (Bolds) could not see any reason why they could not be installed because there are such valves on other acid cars. (Eagar Dep. at 135.)

133.   Dr. Eagar acknowledges that the addition of a valve would increase the length of the eduction pipe. (Eagar Dep. at 143.) When asked how much taller that would make the pipe, he stated it depends on what valve you put in, and, "I don't know, you would . . . have to be a

tank car designer and get it approved by AAR.  And that's not my area of expertise." (Eagar Dep. at 144.)

134.   Dr. Eager testified that the splashing of acid must have been due to pressure build-up in the tank car.  (Eagar Dep. at 22.)

135.   Dr. Eagar did no research into OSHA regulations for this case.  (Eagar Dep. at 58-59.)

136.   Dr. Eagar has no opinion on whether NorFalco failed to comply with DOT or OSHA regulations.  (Eagar Dep. at 136.)

137.   On the issue of warnings, Dr. Eagar testified that the proper way to resolve the issue was by addition of the valve, not by a warning.  (Eagar Dep. at 144-145.)

138.   When asked what warning should have been given in the absence of a valve, Dr. Eagar stated, "Hazardous, do not use.  I don't know."  (Eagar Dep. at 148.)

### *Safety and Feasibility of a Valve on the Eduction Line.*

139.   Seay Harder, the Director of Risk Management and Technical Services for NorFalco, when asked at his deposition whether the installation of a valve on the eduction pipe would be "prudent" or "needed", explained that he would defer to design experts on that question, but stated that he was "not sure a valve would prevent people from making mistakes and opening the valve while the car was still under pressure."  (Harder Dep. at 106.)  He elaborated by stating,

> "if someone opens that valve with the car still under pressure, there's going to be a problem. So, in my view, it's not a clear answer…, if (operators) don't follow proper procedures, they're going to have a problem, whether it's a valve or a cap or anything else.  If they didn't vent the car, the acid is going to come out."

(Harder Dep. at 107.)

140.    In 2004, Jocelyn Arcouette was a technical representative for NorFalco. (Arcouette Dep. at 13.) In his job, he gave safety seminars, coordinated the emergency response team and was responsible to keep and update specifications for tank cars used by NorFalco. (Arcouette Dep. at 13-14, 22-23.)

141.    Mr. Arcouette had occasion to consider the use of a valve on an eduction pipe when a customer asked him about the possibility of installing a valve so that there would be no need to relieve pressure before unloading. (Arcouette Dep. at 72-74.) Mr. Arcouette thought that was a "bad idea" because it "would exactly produce something probably more hazardous than what some people might think it would resolve." (Arcouette Dep. at 75.) He explained further:

> "Because of an acid valve on an acid cars -- I mean, we have the same experience at our plant. You load a car, a tank car do a trip about once a month and it expose with strong acid, weak acid, which is very corrosive to steel. Surprisingly, like stainless steel or carbon steel resist quite easily to strong material, to weaker material. So the valve will deteriorate over time and it will give people a false feeling of safety that, oh, there's a valve now, I don't depressurize the car anymore. Personally won't matter if there's a valve or no valve, I would always depressurize a car before doing anything."

(*Id.*)

142.    Defendants disclosed John Badger as one of its liability experts. Mr. Badger has a Masters degree in transportation, is a Certified Transportation Logistician, and substantial hands-on experience in the transportation of chemicals, including sulfuric acid, as Director of Transportation and Distribution Services/Chemicals with the Olin Corporation. (Exhibit AA: Report and Curriculum Vitae of John Badger.)

143.    Mr. Badger opines that there are over 10,000 railroad cars in sulfuric acid service in the United States and Canada, none of which are equipped with a valve on the eduction line. (Badger Report at 3-4.) This is the industry standard. (*Id.*)

144.     As he explained in both his report and his deposition, a valve on the eduction line presents hazards in transportation:

> DOT regulations require that the car be completely closed with a fail-proof system when offered for transport and while in transit. The car must be able to withstand a derailment or other in-transit accident without releasing lading to the environment. Sulfuric acid cars are equipped with a threaded cap which is securely attached to the end of the eduction outlet. This arrangement is much safer and more secure in the event of an accident than a valve or other similar device would be.

(Badger Report at 3-4.)

145.     A valve would be subject to a high degree of corrosion from sulfuric acid during the unloading process which would cause maintenance issues and a high level of possibility of failure. (Badger Dep. at 115.)

146.     Furthermore, approval of a valve for an eduction line by AAR is not a foregone conclusion. In light of the new requirements for low-profile rollover protection, there might not be sufficient room to fit a valve on the eduction line, and a valve might be deemed inadvisable in transportation. (Badger Dep. at 115-116.)

### *NorFalco Tracking of Incidents*

147.     NorFalco carefully tracks incidents involving the handling or transportation of its sulfuric acid. NorFalco has produced indices of these incidents from 2001 to the date of Roth's injury. The indices reveal eighth (8) incidents involving customer unloading of rail road tank cars. The incidents are summarized as follows:

| Date | Description | Reported Causes |
|------|-------------|-----------------|
| 01/10/2002 | Air line was opened to rail car before acid line was attached. Caused spill | Procedure – loader not following procedure |
| 01/10/2002 | Unloading hose came off eduction pipe during off unloading and splashed employee | Splash – suspect that unloading line was cross threaded and came off when employee bumped line |
| 01/24/2002 | When disconnecting unloading line, loader was sprayed with an acid mist to the face | Splash – suspect that the rail car was not completely bled off when loader disconnected line |
| 02/26/2003 | Employee splashed when connecting rail car for unloading | Pressure was not released prior to employee removing eduction pipe cap |
| 05/13/2003 | Operator burnt when unloading rail car. Disconnected hose prior to shutting off air, was not wearing PPE, working alone and at night | Not following procedure, no PPE |
| 09/09/2003 | Operator was splashed while disconnecting eduction pipe cap. Insists car was depressurized properly | |
| 05/21/2004 | Loader opened fill hole cover prior to properly depressurizing | Loader did not follow procedure |
| 06/01/2004 | Customer was splashed when he unscrewed the eduction pipe cap. No injury or damage | Customer did not have proper procedure |

(Exhibit BB: Indices to Tracking Devises)[5]

---

[5] NorFalco does not acknowledge that any of these incidents or the indices, are admissible in evidence, but refers to them because they may be relevant to issues in summary judgment.

Respectfully submitted,

By: /s/  Richard T. Sikes, Jr.

Dennis R. Sheffer
TUCKER ARENSBERG, P.C.
111 North Front Street
P.O. Box 889
Harrisburg, PA
17108-0889
Telephone: (717) 234-4121
Facsimile: (717) 232-6802
Dated:  April 11, 2008

1480168v7

Richard T. Sikes, Jr.
Marc H. Kallish
FREEBORN & PETERS LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
Telephone:  (312) 360-6000
Facsimile:  (312) 360-6575

Counsel for Defendant

## CERTIFICATE OF SERVICE

The undersigned being an attorney in this matter certifies that a true and accurate copy of the **Defendant's Rule 56.1 Statement of Uncontradicted Materials Facts in Support of Its Motion for Summary Judgment** was served upon all parties of record in the above cause, via U.S. Middle District's Electronic Case Filing on April 11, 2008.

### SERVICE LIST

Albert J. Evans
Riley and Fanelli, P.C.
No. 1 Mahantongo Street
Pottsville, PA  17901
cjones@rileyandfanelli.com

Dennis R. Sheaffer
Tucker Arensberg, P.C.
111 North Front Street
P.O. Box 889
Harrisburg, PA  17108-0889
dsheaffer@tuckerlaw.com

By: /s/  Richard T. Sikes, Jr.
Richard T. Sikes, Jr.
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone:  (312) 360-6000
Facsimile:  (312) 360-6594
Counsel for Defendant