# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID ROTH and BETSY ROTH,** | : | |
| **Plaintiffs** | : | Civil Action No. 1:06-cv-01452 |
| v. | : | (Chief Judge Kane) |
| **NORFALCO, LLC,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the Court is Defendant NorFalco's motion for summary judgment. (Doc. No. 40.) Plaintiffs have responded to the motion, and Defendant has filed a brief in reply. The motion is ripe before the Court for disposition, and for the reasons that follow, the motion will be granted.

## I. BACKGROUND

P.H. Glatfelter Company ("Glatfelter") is a paper-manufacturing company. (Doc. No. 41-1 at 3-4.) Glatfelter purchases sulfuric acid to bleach wood pulp as part of the paper-making process. (Id. at 9; Doc. No. 41 ¶ 9.) At or about the time of the accident, Glatfelter purchased all of its sulfuric acid, approximately 40,000 pounds per day, from Defendant NorFalco, LLC. (Doc. No. 41 ¶¶ 11, 13.) The sulfuric acid was transported from NorFalco's factory in Canada to Glatfelter's paper mill by railcar tanks ("railcars"). (Id. ¶¶ 12, 14, 32, 46.) Once at Glatfelter's rail yard, the acid within the railcars would usually be unloaded into a sulfuric acid storage tank by Glatfelter employees, one of whom is Plaintiff David Roth ("Roth"). (Id. ¶¶ 12, 14, 46.)

Roth began working at Glatfelter in 1981. (Doc. No. 41-1 at 3-4.) He held various positions in Glatfelter's facility over the course of his employment, but only began working with sulfuric acid after April 16, 2002, when he began the position of Lubricator in the pulp mill. (Id. at 6.) As a Lubricator, Roth also served as the Back-up Chemical Unloader. He was trained how

to unload sulfuric acid from the railcars by Jeff Lau, the Chemical Unloader at that time. (Id. at 14.) On August 3, 2004, Roth assumed the position of Chemical Unloader, which he held until the date of his accident, August 13, 2004. (Id. at 8.) Roth resumed the position of Chemical Unloader when he returned to work in August 2005. (Id. at 8.) As a Chemical Unloader, Roth's primary role was to unload the sulfuric acid from the railcars transported to Glatfelter by NorFalco. Roth explained his typical procedure to unload a railcar of sulfuric acid as follows.

Before unloading a railcar, Roth would check the acid level in the storage tank and then put on chemical resistant pants, rubber gloves and boots, and goggles for safety. (Id. at 41; Doc. No. 41-4 at 18.) He would then secure the railcar so that no other trains could enter the platform. (Id.) Once these preliminary activities were completed, he would "bleed off," or vent, the railcar to relieve pressure that may have built-up inside the car during transportation. (Id. ¶ 25.) To accomplish this, he would climb up the side of the railcar to unhook the "top fitting," a chain on the railcar that blocks access to the top of the railcar. (Id.)

The next step would be to remove the cap covering the air inlet. Before the cap can be safely removed, however, Roth would need to ensure that the Jamesbury valve over the air inlet was shut. Then, he would unscrew the cap covering the air inlet and crack the Jamesbury valve to allow the car to depressurize. (Id.) Once the Jamesbury valve was opened, he would observe that the railcar was depressurizing by running his hand across the valve to feel the air escape or by listening to the air escape. (Id. at 18-19.)

Once depressurized or "bled off," Roth's next step would be to unscrew a second cap on top of the railcar. (Id. at 19.) This second cap would be unscrewed in the same manner as the first. (Id.) Once the second cap was removed, an "elbow" specially made by Glatfelter for this

2

purpose, would be screwed onto the second air inlet. (Id.) A rubber hose ("acid hose"), which transports the acid from the railcar to the storage tank, would be attached to the elbow. (Id.) After attaching the "acid hose" to the elbow, a second rubber hose ("air hose") would be attached to the first air inlet. (Id.) The air hose pumps air into the railcar to maintain pressure while the acid is unloaded from the railcar through the acid hose. (Id. at 20.) It usually would take approximately two hours to empty the sulfuric acid from the railcar into the storage tank. (Id. at 22.) Once the acid was unloaded, Roth would turn off the air pressure, close off the air inlet valve on the railcar, remove the rubber air hose, and crack the Jamesbury valve on that air inlet back open to ensure that all the air pressure is released from the railcar. (Id. at 22-23.) Then, the valves on the elbow would be shut and the acid hose removed, as well. (Id. at 23.)

Beginning on or before August 2004, the usual acid unloading process was changed because the acid storage tank was out of service. (Id. at 28, 31.) Instead of unloading the acid into the storage tank, the acid was unloaded through a flexible metal hose directly to the bleach plant. (Id. at 30.) Because the bleach plant was farther from the rail yard than the acid storage tank, unloading the acid required that additional air pressure be added to the air hose. (Id.) This alternative unloading method also required that the acid be unloaded in smaller portions, thus an entire railcar would not be unloaded at once. (Id.) Instead, a valve at the bleach plant would be used to control the amount of acid released at a particular time, resulting in a multi-day unloading process. (Id. at 32.)

On or about August 11, 2004, a railcar had been partially-unloaded in this manner when Roth had difficulties removing the remainder of the acid from the railcar. (Id. at 33-34.) Ralph Martin, Roth's supervisor, instructed Roth to deactivate the partially-unloaded railcar and to

connect the hoses to a new, full railcar so that more acid could be unloaded. (Id.) Roth completed his usual shut-down procedure, but left the elbow on the railcar to identify it as the partially-unloaded car. (Doc. No. 41-18 at 3.) He also left the Jamesbury valve cracked open for the air to depressurize from the railcar. (Id.)

On Friday, August 13, 2004, Martin instructed Roth to remove the elbow from the partially-unloaded car and to place it on a full railcar. (Id. at 7-8.) Roth mounted the designated railcar and began to remove the elbow as instructed. (Id.) Acid began "flying out" of the inlet from where the elbow had been screwed into the car. (Id. at 8) Roth had not attempted to depressurize the car immediately prior to removing the elbow because he believed "[t]he car was already depressurized . . . There was no procedure for the second time on a car." (Id.) Acid splashed out of the car, hitting Roth in the chest and face and causing severe burns. (Id. at 9.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this

determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### III. DISCUSSION

NorFalco argues that Counts I, III, and IV must be dismissed because the preemption provision in the HMTA, which governs transportation of hazardous material, precludes Plaintiffs' claims. Specifically, NorFalco contends that the railcar in use at the time of Mr.

5

Roth's accident complied with the federal standards, and thus any additional requirement on the railcar imposed by virtue of these state common law claims would run afoul of the federal regulatory scheme. By contrast, Plaintiffs allege that none of their claims are preempted because the railcar, even if compliant with federal transportation standards during transportation, was improperly packaged for the unloading of hazardous material once transportation was complete. They assert that the railcar should have been equipped with a pressure gauge on the outside of the railcar to indicate the presence of dangerous pressure within or a valve on the liquid line to relieve pressure within the car when it develops.[1] With respect to Count II of Plaintiffs' complaint, Defendant moves for summary judgment on the basis that "unloading sulfuric acid" is not an unreasonably dangerous activity subject to strict liability. Plaintiffs disagree.

The Court will begin by analyzing the preemption issue and then turn to whether unloading sulfuric acid from a railcar is subject to strict liability as an ultrahazardous or abnormally dangerous activity.

### A. Preemption

The doctrine of preemption, rooted in the Supremacy Clause, requires that federal law shall prevail over any conflicting state law. Hawkins v. Leslie's Pool Mart, Inc., 184 F.3d 244, 247 (3d Cir. 1999). To determine whether a claim is preempted, a court begins by looking to the congressional intent underlying the federal statute at issue. Id. A court must "identify the domain expressly preempted," which entails an analysis of the textual language of the statute,

---

[1] Although Defendants tentatively address other remedial measures Plaintiffs' expert proposed, Plaintiffs, in their brief in opposition, assert only their arguments that a pressure gauge or a valve on the liquid line would have prevented Mr. Roth's injuries. The Court will follow Plaintiffs' lead.

examination of the statutory framework, and occasionally a consultation of the legislative history. Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996); Hawkins, 184 F.3d at 248. It is presumed that historic state police powers are not superseded absent clear congressional intent. Id. "[O]nly when the 'Federal Government has weighed the competing interest [and] reached an unambiguous conclusion about how those competing considerations should be resolved in a particular cases [sic] and implemented that conclusion via a specific mandate' are general state common-law claims preempted." Hawkins, 184 F.3d at 254, (quoting Medtronic, 518 U.S. at 501).

In this case, the express wording of the federal statute at issue, the Hazardous Materials Transportation Act ("HMTA"), makes clear that Congress intended to preempt at least some state laws. 49 U.S.C. §§ 5101-5128; see also, Medtronic,, 518 U.S. at 484. The HMTA provides, in pertinent part:

> (b) **Substantive differences.–** (1) a law, regulation, order, or other requirement of a State . . . about any of the following subjects, that is not substantively the same as a provision of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security, is preempted:
>
> . . .
>
>     (B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.
>
> . . .
>
>     (E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.
>
> . . .

49 U.S.C. § 5125 (2003). This language is sufficient to encompass preemption of not only state regulations, but also state common law claims.² See Medtronic, 518 U.S. at 487-88 ("[W]e have on prior occasions concluded that a statute pre-empting certain state "requirements" could also pre-empt common-law damages claims . . . ."). That does not end the matter, however, because not every claim related to the HMTA is preempted. The Court must now use the regulations developed to support the HMTA to determine whether Plaintiffs' claims are within the domain intended by Congress for preemption.

In the HMTA, Congress directed the Secretary of Transportation to develop regulations "for the safe transportation, including security of hazardous material in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5103(b) (2003). The Department of Transportation ("DOT") has enacted such regulations, the Hazardous Material Regulations ("HMR"), and they are codified at 49 C.F.R. §§ 171-179. The HMR classify sulfuric acid as a hazardous material and specify types of railcars and safety mechanisms to be used for its transportation. See 49 C.F.R. § 172.101 (2003) (table classifying sulfuric acid as hazardous material); 49 C.F.R. § 173.242 (2003)

---

²In fact, the breadth of the HMTA preemption clause is greater than that of the preemption clauses analyzed by the Supreme Court in Medtronic and the Third Circuit Court of Appeals in Hawkins. The statutes at issue in Medtronic (Medical Device Amendments "MDA") and Hawkins (Federal Insecticide, Fungicide, and Rodenticide Act "FIFRA") each only stated that state "requirements" should be preempted, whereas the HMTA requires that each "law, regulation, order, or other requirement" be preempted. Compare 49 U.S.C. § 5125 with 21 U.S.C. § 360(k) and 7 U.S.C. § 136v (emphasis added). Although the Courts in Medtronic and Hawkins reluctantly concluded that state common law claims could be preempted through the use of the phrase "state requirements," they opined that Congress could have been more clear. Medtronics, 518 U.S. at 487 ("If Congress intended to preclude all common-law causes of action, it chose a singularly odd word with which to do it."); Hawkins, 184 F.3d at 249 ("If Congress' true intention was to preclude all common law causes of action, it could have stated that all remedies, rather than requirements . . . are precluded."). The HMTA preemption provision, with its inclusion of "law, regulation, [or] order" largely satisfies this concern, and it exemplifies the expansive nature intended for this provision.

(designating the particular classes of railcars to be used in transportation of sulfuric acid); 49 C.F.R. § 179 Subpart D (2003) (specifications for railcars). The regulations further require that railcars be approved by the Association of American Railroads ("AAR") before they may be used for hazardous material transport. See 49 C.F.R. § 179.3 (2003). The AAR publishes its own specific requirements and options for railcar approval. AAR Manual, reproduced in part at Doc. No. 41-25. The HMR regulations, and those set out by the AAR, specifically provide for the types and locations of valves on railcars to support pressurization and depressurization. (Doc. No. 41-25.) As stated, this regulatory scheme applies to all railcars to be used for the interstate "transportation" of sulfuric acid. 49 U.S.C. § 5103. The term "transportation" or "transport" is defined in the HMTA and in the HMR as "the movement of property and loading, unloading, or storage incidental to the movement." 49 U.S.C. § 5102(12) (2003). The term "unloading incidental to the movement" was neither defined by Congress in the HMTA nor the DOT in the HMR.[3]

---

[3] This has changed since the time of Mr. Roth's accident. Currently, the regulations indicate that unloading of bulk liquid hazardous material, *e.g.,* sulfuric acid from a railcar, is not subject to the HMR, but that was not always the case. 49 C.F.R. § 171.1(d). This change in language indicates a change in interpretation of the HMR, bolstering the Court's conclusion that at the time of Roth's accident, Congress intended to pre-empt his claims. See, DOT Regulatory Evaluation, Regulatory Flexibility Analysis, and Environmental Assessment-HM-223, 2003 WL 24117279 (Nov. 17, 2003) (discussing the proposed definitional change to "unloading incident to transportation" and suggesting that the "do nothing" approach would result in accidents occurring at the time of unloading by a consignee being covered by the HMR). In other words, if the Court were to look at the issue as one strictly regarding whether state common law could impose additional requirements on a railcar during unloading bulk hazardous material, rather than as one of whether state common law can impose additional requirements on a railcar that must be present during transportation and unloading, the Court would still find that Plaintiffs' claims are preempted.

While, at first blush, Glatfelter's prolonged unloading of hazardous material from the stationary railcar seems distinguishable from the transportation of that material, and thus calling into question the definition of the term "unloading incidental to movement," the dichotomy between unloading and transportation in this situation is a false one. Unlike materials which are individually packaged and then placed into a carrier vessel for transportation, *e.g.*, the chlorine tablets in Lyall v. Leslie's Poolmart, 984 F. Supp. 587 (E.D. Mich. 1997), sulfuric acid is pumped directly into a railcar for transportation. The railcar, then, serves the dual role of both carrier and package of the hazardous material.[4]

Conceiving the railcar as both the carrier and the container of NorFalco's sulfuric acid product is imperative to an understanding of the way bulk hazardous liquids are transported through interstate commerce, and thus the domain preempted by the HMTA. Although Plaintiffs' injuries occurred when Roth was unloading the sulfuric acid from the railcar/container once the railcar had completed movement, any change to the railcar as container would also impact the railcar as transportation. This considered, Plaintiffs' claims must be preempted because the Federal Government has "weighed the competing interests . . . [and] reached an unambiguous conclusion about how those competing interests should be resolved" to effectuate the safe transportation of hazardous materials. See Hawkins, 184 F.3d at 254.

Specifically, DOT has decided that sulfuric acid must be transported in one of several kinds of railcars: Class DOT 103, 104, 105, 109, 111, 112, 114, 115, or 120. 49 C.F.R. §

---

[4]This is consistent with the Court's previous determination that, "for the purposes of strict liability under § 402A, the railroad tank car and the sulfuric acid contained within it are a single product" because the railcar is the packaging in which the sulfuric acid is supplied to its consumers. (Doc. No. 34 at 3.)

173.242. The designs, materials, construction and alteration of those classes of railcars must be expressly approved by the AAR Tank Car Committee before they can be used for commercial transportation of hazardous materials. 49 C.F.R. § 179.3 (2003). For railcars in class DOT 111AW, as was the railcar in use at the time of Roth's accident, the standards specifically require that in the case of

> gauging devices, top loading and unloading devices, venting and air inlet devices . . . [w]hen the characteristics of the commodity for which the car is authorized are such that these devices must be equipped with valves or fittings to permit the loading and unloading of the contents, these devices, including valves, shall be of an approved design . . . .

49 C.F.R. § 179.200-16 (2003). The railcar in use at the time of Roth's accident was AAR-approved.[5] Thus, the valves and fittings for unloading sulfuric acid from the railcar at issue in this case were specifically regulated and approved by the AAR. The AAR did not require the valve or pressure gauge proposed by Plaintiffs, though the AAR does permit such valves and has approved of them in other cases. See, e.g., Doc. No. 60-24.

If the Court did allow Plaintiffs' claims to go forward, a favorable jury verdict would effectively impose the additional requirement of a pressure gauge or valve on all railcars that transport hazardous material into the Commonwealth of Pennsylvania for unloading. Any such imposition would run afoul of Congress' intent in creating the HMTA: to create a federally uniform system of regulation over the transportation of hazardous materials, because each state would be able to create its own additional requirements on railcars used to unload material

---

[5]There is no dispute that the railcar used by NorFalco met AAR/HMR requirements.

within the state.[6] Such a requirement, though permissible under the regulations, is not "substantively the same as" the HMR requirements precisely because the federal regulatory scheme approved the use of the Defendant's railcar without the additional valves or pressure gauges proposed by Plaintiffs. 49 C.F.R. § 107.202(d) (2003) (defining "substantively the same" as "conform[ing] in every significant respect to the Federal requirement"). If a state requirement is not "substantively the same" as the HMR requirements, it is preempted by the HMTA. 49 U.S.C. § 5125 (2003) (expressly preempting all state requirements that are not "substantively the same" as the HMTA).

The Third Circuit Court of Appeals' holding in Hawkins is analogous. In Hawkins, the plaintiffs argued that the defendant's chlorinator tablets were negligently labeled. The defendants responded to this argument by alleging that the label was approved by the EPA pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), thereby preempting the plaintiffs' claims. The court found that the EPA's approval of the label used on the defendant's chlorinator tablets, preempted the plaintiffs' claims. The court emphasized the explicit approval procedure utilized by the EPA and reasoned that "had the EPA felt that additional language on the opening, closing, storage or use of the tablets was necessary, it would have required that [the

---

[6]In enacting the HMTA preemption provision relevant to this case, Congress stated its intent to prevent such an outcome. Congress explicitly found that "many States and localities have enacted laws and regulations which vary from Federal laws and regulations pertaining to the transportation of hazardous materials, thereby creating the potential for unreasonable hazards in other jurisdictions and confounding shippers and carriers which attempt to comply with multiple and conflicting registration, permitting, routing, notification, and other regulatory requirements," and that "because of the potential risks to life, property, and the environment posed by unintentional releases of hazardous materials, consistency in laws and regulations governing the transportation of hazardous materials is necessary and desirable." HMTA of 1990, Pub L. No. 101-615, § 2, 104 Stat. 3244 (1990).

12

defendant] include such language." Hawkins, 184 F.3d at 252. Here, the same can be said for the DOT's approval process. As explained, the HMR regulations require that each railcar design be approved by the AAR before use in transporting sulfuric acid. The railcars used by NorFalco were subject to the AAR's approval process and approved. Had the AAR felt that an additional valve or pressure gauge was necessary for the safe unloading of hazardous material from the railcar at issue, it would have required such valve or pressure gauge to be on the car before approving it for use. The AAR did not do so. Accordingly, the Court finds, as the Third Circuit did in the plaintiffs' labeling claim in Hawkins, that Plaintiffs' claims are preempted.

### B. Strict Liability Restatement Section 519

Defendant does not argue that Plaintiffs' strict liability claim brought pursuant to § 519 of the Restatement (Second) of Torts is subject to preemption. Instead, Defendant moves for summary judgment on this claim on the basis that 1) it does not "unload sulfuric acid through railroad tank cars" as Plaintiffs allege in this count of their complaint and 2) that unloading sulfuric acid is not an "abnormally dangerous activity." The Court will resolve the issue by addressing whether unloading sulfuric acid is an abnormally dangerous activity.

Pennsylvania has adopted the Restatement (Second) of Torts § 519 and § 520, such that the doctrine of absolute liability applies to the exercise of ultrahazardous or abnormally dangerous activities. See Albig v. Mun. Auth. of Westmoreland County, 502 A.2d 658, 662 (Pa. Super. Ct. 1985). Absolute liability "will be applied to ultrahazardous activities which cannot be made safe by the exercise of utmost care." Id. (citations omitted). Restatement § 519 provides:

> One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

13

To determine whether an activity is abnormally dangerous, a court should consider the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520. The question is one for the court, and it boils down to whether "the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for harm that results from it, even though it is carried on with all reasonable care." Id. at Comment (f); Melso v. Sun Pipe Line Co., 576 A.2d 999, 1003 (Pa. Super. Ct. 1990). This doctrine has been traditionally applied to blasting activities and to keeping wild animals. Albig, 502 A.2d at 662. Pennsylvania courts have found that operating petroleum or natural gas pipelines and maintaining large water storage facilities for community use are not abnormally dangerous activities. Melso, 576 A.2d at 1003; Albig, A.2d at 664. Relating to sulfuric acid use, courts have also found that the transportation and use of sulfuric acid is not an abnormally dangerous activity. Edwards v. Post Transp. Co., 228 Cal.App. 3d 980 (Cal. Ct. App. 1991) (sulfuric acid accidentally unloaded into wrong storage tank causing release of toxic gas not ultrahazardous because the danger can be eliminated through use of due care); Harkin v. Ferrero, 38 Pa. D. & C. 2d 412 (Pa. Ct. Com. Pl. 1965) (sulfuric acid used for residential cleaning not ultrahazardous).

Considering the above factors and case law, the Court finds that the unloading of sulfuric acid from a railcar is not an abnormally dangerous activity. The hallmark of an abnormally dangerous activity under this doctrine is that the activity cannot be made safe through the

14

exercise of due care. Yet, both experts have agreed that unloading sulfuric acid from a railcar is safe so long as the car is depressurized prior to the unloading. (Doc. No. 41 ¶ 129.) The depressurization of the railcar requires no more than due care, thus unloading sulfuric acid from a railcar does not meet the definition of an abnormally dangerous activity.

Moreover, the factors also indicate that unloading sulfuric acid should not be considered an abnormally dangerous activity. To begin, the Court finds that factors (a) and (b) balance out one another. The risk of harm caused by sulfuric acid if it is unloaded improperly can be serious, including intense burns to the skin, as Mr. Roth's injury demonstrates. This weighs in favor of Plaintiffs. However, the risk of such an activity occurring does not appear to be great. As the evidence on the record indicates, NorFalco distributes over two-million tons of sulfuric acid a year to hundreds of customers, and only eight accidents have occurred in unloading the sulfuric acid over a four-year period. (Doc. No. 41); www.norfalco.com. Plaintiffs have not countered these facts with record evidence to demonstrate that accidents occur more frequently. This factor weighs in favor of Defendant.

Factor (c) weighs in favor of Defendant since the risk can be completely eliminated through the use of due care. As stated above, an unloader need only depressurize the railcar prior to the unloading process to ensure the product is safe to unload. This factor weighs strongly for Defendant.

Defendant argues that factor (d) also weighs in its favor because sulfuric acid is "one of the most commonly used chemicals in the world." (Doc. No. 41 at 32.) However, as pointed out in Edwards, this factor does not consider the activity relative to other dangerous activities or within certain sectors of the population, but rather, considers the activity's ubiquity in the

community. Edwards, 228 Cal.App. 3d at 985-86. The reasoning of the Edwards court is supported by the Comment on Clause (d) in the Restatement, which distinguishes the "usual" danger of automobiles to which the ordinary "mass of mankind" is exposed, from the "abnormal" danger of drilling oil which, while important to the community, is not a danger experienced by the majority of the population. Restatement (Second) Torts § 520, Comment on Clause (d). Sulfuric acid is not routinely unloaded from railcars in the community, thus unloading sulfuric acid cannot be deemed "a matter of common usage." This factor tips toward Plaintiffs

Unlike the prior factor, the fifth factor does take into consideration the location where the action occurred in determining its abnormality. Here, the sulfuric acid was unloaded at the rail yard of a paper mill in Spring Grove, Pennsylvania. The parties have opined that over 40,000 pounds of sulfuric acid were unloaded at the Glatfelter paper mill per day, indicating that the unloading of sulfuric acid at this location was an important and routine occurrence. (Doc. No. 41 ¶ 13.) Indeed, approximately one to two railcars of sulfuric acid were unloading at the paper mill per week. (Id. ¶ 12.) Not only were the workers at Glatfelter, including Plaintiff Roth, thus accustomed to unloading the acid, but the location of the unloading did not expose unsuspecting members of the community to the risk of injury from acid spraying out of a railcar during unloading. This factor weighs in favor of Defendant.

Last, the Court considers whether the activity's value to the community negates its risk of harm. The Restatement explains this factor as the prosperity the activity provides to the community. For example, an oil well may not be considered abnormally dangerous in Texas or Oklahoma because of the importance the oil industry has to the local economy, whereas the same

16

oil well in Indiana or California might be found abnormally dangerous because it is a lesser industry in those areas. Restatement (Second) Torts § 520, Comment on Clause (f). Neither party provided the Court with any material on the record to indicate the importance of sulfuric acid to the particular community at issue. Certainly, the importance of unloading sulfuric acid, or the manufacture of paper is not as quintessential to the local economy as oil is to Texas, but the record does indicate, at the least, that a significant amount of sulfuric acid was necessary to the production of paper, and thus the prosperity of the Glatfelter plant. On balance the Court finds that this factor may weigh slightly in favor of Defendant, but the Court does not give it much consideration in light of the absence of evidence on this point.

Upon consideration of all the factors, the Court finds that unloading sulfuric acid is not unreasonably dangerous as the term is considered by § 519. No factors weigh strongly in Plaintiffs' favor, and the hallmark of an abnormally dangerous activity–that it cannot be made safe through the exercise of due care–is not present here. Plaintiffs' strict liability claim for abnormally dangerous activities will be dismissed.

Last, the Court turns to Count V of the complaint, a derivative claim brought by Mrs. Roth for loss of consortium. As the first four Counts have all been dismissed, this claim cannot stand, and will be dismissed, as well. See Keirs by Keirs v. Weber Nat'l Stores, Inc., 507 A.2d 406, 410 (Pa. Super Ct. 1986).

## III.    CONCLUSION

For the reasons stated in the foregoing, the Court finds that Counts I, III, and IV of Plaintiffs' complaint are preempted by the HMTA. The Court also finds that the activity of unloading sulfuric acid is not ultrahazardous or abnormally dangerous under Pennsylvania law.

17

Accordingly, the motion for summary judgment will be granted, and Plaintiff's complaint will be dismissed in its entirety.

An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID ROTH and BETSY ROTH,** | : | |
| | : | |
| Plaintiffs | : | Civil Action No. 1:06-cv-01452 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| **NORFALCO, LLC,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

**AND NOW**, this 29th day of April 2010, upon consideration of Defendant's motion for summary judgment (Doc. No. 40), **IT IS HEREBY ORDERED** that the motion is **GRANTED.** Plaintiffs' claims are dismissed and the Clerk of Court is directed to close the case.

>                                  *s/ Yvette Kane*
>                                  Yvette Kane, Chief Judge
>                                  United States District Court
>                                  Middle District of Pennsylvania